*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 21, 2019

Plaintiff-Appellee,

v

No. 344844
Genesee Circuit Court
LC No. 17-040672-FC

GARY ANTHONY MAHAN,

Defendant-Appellant.

Before: O'BRIEN, P.J., and GADOLA and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of kidnapping, MCL 750.349(1)(c), and first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1), against the victim, SD.[1] The jury acquitted defendant of the same charges against another victim, JB. The trial court, applying a "super habitual" supplement under MCL 769.12(1)(a), sentenced defendant to two concurrent terms of 25 to 37½ years' imprisonment. We affirm.

## I. BACKGROUND

This case arises from events beginning in the late hours of October 23, 2016, and stretching through the morning of October 24, 2016. On the night of October 23, 2016, 17-year-old SD and 18-year-old JB were drinking alcohol, and went with some friends to Angela Shirley's home in Flint. Angela was defendant's girlfriend at the time. One of the people that SD and JB went to Angela's house with was a friend of Angela's son, Michael Shirley. As the night progressed, everyone decided to go to defendant's house, where they had a bonfire. SD

---

[1] The jury was provided with two alternative theories for CSC-I: penetration under circumstances involving a kidnapping, see MCL 750.520b(1)(c), and penetration while armed with a weapon, see MCL 750.520b(1)(e). The jurors were informed that for purposes of conviction, unanimity was not required regarding which aggravating circumstance applied, as long as each juror found an aggravating circumstance.

and JB continued to drink heavily, and, as a result, they were unable to remember many of the events from that night. Everyone agreed, however, that SD and JB's friends left SD and JB at defendant's home that night. Everyone also agreed that, after SD and JB's friends had left, Angela became angry with defendant for having SD and JB over, and so defendant sent SD and JB over to his neighbor's home for a period of time. Finally, everyone agrees that, in the early morning hours of October 24, 2016, SD and JB returned with defendant to his bedroom.

This is where the relevant events from the evening occurred, and where the testimonies of defendant and the victims diverge. SD testified that she remembered waking up in defendant's room and saw defendant lying "on top of" JB. SD said that defendant was "[t]ouching" JB and that "her pants were halfway down." It looked to SD as if defendant's hands were "down [JB's] pants." SD testified, "I looked over at her and I kind of like mouthed did you want that to happen and she mouthed back to me and said no." SD described JB as being "really messed up" and "under the influence of something." JB somewhat similarly testified that defendant got on top her and tried to kiss her, which she did not want.

SD testified that she asked defendant to use his phone multiple times, but he would not let her. JB similarly testified that she and SD asked to use defendant's phone, but he refused and "got really mad." Both SD and JB testified that defendant took out a gun from somewhere in the room and pointed it at SD and JB, and made them take off their clothes. Defendant then asked each of them to take a pill, which JB did but SD did not. Both testified that JB asked to use the bathroom, but defendant refused to let her and made her use a trash can instead.

Both SD and JB testified that, while still holding the gun, defendant put his penis in JB's mouth. JB testified that she could not remember a lot of details, but she said that during this time, defendant was lying on the bed with his legs off the bed, and SD was "[o]ver top by his head." SD testified that, while defendant's penis was in JB's mouth, defendant pulled down SD's pants and underwear and, while holding a gun in one hand, put his mouth "[i]n her vagina," which she did not want. On cross-examination, SD said that defendant's mouth came into contact with her vagina while she was seated and that, at the same time, defendant was lying on his back while JB performed oral sex on him. JB testified that defendant ejaculated in her mouth, on her hands, and on her pants or shirt.

According to defendant, he took the girls to his neighbor's house after 5:30 a.m. and the girls returned "after 7:00 in the morning." At that point, all three (defendant, SD, and JB) went back to defendant's bedroom, and everyone went to sleep. Defendant said that he did not own a gun at the time[2] and did not "pull a gun" on SD or JB. He denied giving the girls pills, and said that he did not refuse to let them use his telephone or refuse to allow them to use the bathroom. He denied performing oral sex on SD and denied having JB perform oral sex on him. He said that the girls were "making it up."

---

[2] Angela, defendant's girlfriend, admitted at trial that she had seen a handgun at defendant's house in the past, and text messages from October 24, 2016, between Angela and defendant show that Angela warned defendant that if the police investigated SD's and JB's allegations, his "[g]un" would "need[] to go."

SD testified that the following morning, after defendant fell asleep or passed out, SD "got off the bed as quietly as [she] could and . . . crawled on the floor and . . . creeped down the stairs." She found a woman, later identified as Holly Watters, in a bedroom and asked to use her telephone. SD said that Watters "was confused" and thought that the girls had wanted to be in defendant's bedroom. SD did not think she could get JB downstairs without help because of JB's intoxicated state, so Watters helped SD get JB downstairs. Watters also let SD use her phone and provided the address of the home. SD messaged her boyfriend about what happened and where she was. SD's boyfriend told his mom, Julie Henderson, who went and picked SD and JB up. JB testified that she remembered waking up and getting a ride from Henderson.

Henderson took SD and JB to a hospital. At the hospital, JB "didn't want to be examined," so she left. SD, on the other hand, consented to an examination by a SANE (sexual assault nurse examiner). SD recounted the above events to the SANE. The SANE testified that SD was anxious, crying, and withdrawn. The SANE also testified that she observed JB the same day and saw that she was scared and anxious, although she never examined JB. During SD's examination, the SANE collected evidence, including cuts of SD's underwear and vulvar swabs, which she sent to the Michigan State Police (MSP).

Erica Castor, a forensic scientist in the biology and DNA unit of the MSP, was qualified as an expert in forensic biology. She examined evidence collected from SD at the hospital. Castor submitted a cutting of SD's underwear and vulvar swabs for further DNA analysis. For the underwear cutting, there was a mixture of DNA, so "STRmix" software was used to help with the analysis. Jennifer Morgan, Castor's coworker, was also qualified as an expert in forensic biology, and testified that STRmix is "a mathematical software that looks at mixtures and it can help with the interpretation process of the mixture . . . [and] provide[] a likelihood ratio or a statistic for any comparisons that are made to the evidence sample." The tissue from the underwear cutting was divided into "fraction one" from skin cells and "fraction two" from sperm cells. Morgan testified:

> So, based on the DNA typing results from the underwear cutting fraction one, it is at least 1,600 times more likely if it originated from [SD] and [defendant] then [sic] if it originated from [SD] and an unrelated, unknown contributor. And this analysis provides strong support that [defendant] is a contributor to the underwear cutting fraction one.
>
> * * *
>
> And based on the DNA typing results obtained from the underwear cutting fraction two, it was at least 5.6 times more likely if it originated from [SD] and [defendant] then [sic] if it originated from [SD] and an unrelated, unknown individual. So, this analysis of the underwear cutting fraction two was uninformative.

Theresa Scott, another forensic scientist with the MSP, was qualified as an expert in "biology and body fluid identification." She received two sweatshirts and a pair of yoga pants belonging to JB, and examinations did not reveal any seminal fluid on them. Scott said that it was possible that any seminal fluid was washed away because the clothes were not turned over to

the police until approximately nine days after the night in question. Scott testified that she also examined SD's underwear cutting *after* the DNA testing was completed, and identified one sperm cell from it. Tests also showed the "possible" presence of blood and saliva on the underwear cutting.

The jury convicted defendant of the charges of kidnapping and CSC-I related to SD, and acquitted him of the charges of kidnapping and CSC-I related to JB. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first contends that the evidence presented at trial was insufficient to support his convictions. We disagree. "This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014).

In reviewing a sufficiency-of-the-evidence claim, this Court "review[s] the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution had proved the crime's elements beyond a reasonable doubt." *Id*. Direct and circumstantial evidence can be considered in determining whether the prosecution offered sufficient evidence to support a conviction. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id*.

We first address defendant's conviction of CSC-I under MCL 750.520b(1). MCL 750.520b(1) states, in pertinent part:

> A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> *   *   *
>
> (c) Sexual penetration occurs under circumstances involving the commission of any other felony.
>
> *   *   *
>
> (e) The actor is armed with a weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon.

"Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r).

Defendant's CSC-I conviction was supported by (1) SD's testimony that defendant, without her consent, pointed a gun at her and performed cunnilingus on her while holding the

gun; (2) the SANE's testimony about SD crying and being withdrawn; (3) Morgan's testimony that there was "strong support" for the DNA mixture on SD's underwear having come from SD and defendant, and (4) the evidence of kidnapping as discussed later in this opinion.

Defendant takes issue with the fact that only one sperm cell was located in SD's underwear. But this evidence did not cut against the evidence that supported defendant's conviction. Defendant was not alleged to have ejaculated on SD, but *was* alleged to have performed cunnilingus on her. Morgan testified that it was "fraction one"—and not "fraction two"—of the underwear cutting that led to statistically significant results. Fraction one consisted of "predominantly skin cells," while "fraction two, if there are sperm present would contain more of the male component, or the sperm fraction of the sample." Thus, it was the analysis of the "skin cells" fraction that led to "strong support" for defendant's DNA being present in the DNA mixture, which in turn supports SD's allegations that defendant performed cunnilingus on her.[3]

Defendant also argues that the offenses likely were committed by his neighbor, but nothing in the record supports this assertion. JB testified about the neighbor offering money or a bus ticket in exchange for sex, but the record does not support defendant's assertion that the girls somehow confused defendant with the neighbor when detailing the acts leading to defendant's convictions.

Defendant was also convicted of kidnapping under MCL 750.349(1). That statute states, in pertinent part:

> A person commits the crime of kidnapping if he or she knowingly restrains another person with the intent to do 1 or more of the following:
>
> * * *
>
> (c) Engage in criminal sexual penetration or criminal sexual contact . . . with that person. [MCL 750.349(1).]

" '[R]estrain' means to restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts." MCL 750.349(2). MCL 750.349(4) states, "This section does not prohibit the person from being charged with, convicted of, or sentenced for any other violation of law arising from the same transaction as the violation of this section."

Defendant's kidnapping conviction was supported by SD's testimony about cunnilingus combined with her testimony that defendant would not let the girls leave and that "anytime we tried to move or, you know, gesture towards anything he pointed [the gun] at us." A reasonable

---

[3] We would also note that the testimony about the sperm was from Scott, not Morgan. Morgan was the one who testified about the STRmix, and so the testimony of the sperm cell was not relevant to the "strong support" for the DNA mixture on SD's underwear.

inference from all the evidence, see *Hardiman*, 466 Mich at 428, is that defendant restrained SD with the intent to engage in criminal sexual penetration or criminal sexual contact in violation of MCL 750.349(1)(c).

### III. STRMIX TESTIMONY

Defendant raises three challenges to the admission of the STRmix testimony: (1) that STRmix evidence does not satisfy the requirements of *Daubert*[4] or MRE 702; (2) that the STRmix testimony admitted at trial violated MRE 403; and (3) that trial counsel was ineffective in responding to the STRmix testimony. None of the challenges warrant relief.

### A. *DAUBERT*

The trial court conducted a *Daubert* hearing before trial and ruled that the STRmix evidence was admissible. After the trial court's ruling, in *People v Muhammad*, 326 Mich App 40, 57; 931 NW2d 20 (2018), this Court likewise ruled that STRmix evidence is admissible under *Daubert* and MRE 702. Defendant acknowledges that *Muhammad* is "controlling precedent" and explains that he raised the *Daubert* issue "for later review or in the event of a change in law." Thus, this issue does not warrant appellate relief.

### B. MRE 403

Defendant contends that despite *Muhammad* and the threshold admissibility under *Daubert* and MRE 702, the evidence should have been excluded under MRE 403. That rule states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. [MRE 403.]

Defendant contends that, based on Morgan's testimony that it was at least 1,600 times more likely that the DNA mixture in fraction one of the underwear cutting was from SD and defendant as opposed to SD and an unknown contributor, "at least 255 people" in Genesee County alone could have been the second contributor. But Morgan explained that a probability between zero and 99 would be "uninformative," "100 to 999 is our moderate support and then 1,000 to 9,999 is our strong support category, and then 10,000 or greater is considered very strong support." The jurors, therefore, were adequately informed about the meaning of Morgan's testimony. In particular, they learned that the STRmix program gave only "strong support"—as opposed to "very strong support"—to the hypothesis that defendant contributed to the DNA mixture. There was no "danger of unfair prejudice" in informing the jurors about the probabilities produced by

---

[4] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

scientifically reliable software. And even if there were a danger of unfair prejudice, the probative value of this evidence was not "substantially outweighed" by that danger.

Defendant contends that the evidence should have been excluded under MRE 403 because only one sperm cell was found on SD's underwear. But, as noted, this one sperm cell, as testified to by Scott, was found *after* the DNA testing and was not pertinent to Morgan's testimony about the STRmix analyses.[5] The finding of only one sperm cell does not somehow weaken the STRmix evidence. Defendant was not alleged to have ejaculated on SD, but *was* alleged to have performed cunnilingus on her—so the finding of one sperm cell is not particularly surprising. The evidence was thus admissible under MRE 403.[6]

## C. INEFFECTIVE ASSISTANCE

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge must first find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A court's findings of fact are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*.

To obtain relief based on ineffective assistance of counsel, a party must show (1) that counsel's performance fell short of an objective standard of reasonableness and (2) that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

Defendant contends that counsel should have challenged the STRmix analyses on cross-examination—or by way of a defense DNA expert—based on what he contends are flaws in its methodology, such as that it involves amplification of DNA, that certain "input" factors are

---

[5] As already stated, the statistically significant test came from testing skin cells from "fraction one," not "fraction two." Explaining the difference of these "fractions" at the *Daubert* hearing, Morgan testified:

> [T]he extraction method or part of the DNA process with samples that could potentially contain sperm is a little bit different; and so we can—we isolate fraction one, which would be essentially the female portion or the portion that would contain predominantly skin cells, and fraction two, which is the fraction that would contain the male fraction—or, if sperm were present, the sperm cells may be there in fraction two.

[6] Defendant argues that defense counsel at trial was ineffective for not objecting to the admission of the STRmix testimony under MRE 403, but because the testimony was admissible under MRE 403, counsel was not ineffective for failing to object based on that rule. *People v Horn*, 279 Mich App 31, 39-40; 755 NW2d 212 (2008) (discussing futile objections).

determined by human operators, and that the governing standards are voluntary. But the trial court had already deemed the evidence admissible under MRE 702.[7]

MRE 702 requires that the testimony in question be, among other things, "the product of reliable principles and methods[.]" It was not below an objective standard of reasonableness for counsel to fail to challenge the reliability and methods of a scientific and mathematical procedure that had already been deemed admissible before trial by the trial court (and later verified as admissible by this Court in *Muhammad*). To the extent that defendant is attempting to allege that the analyses in *this case* were flawed because of improper input factors or similar erroneous actions that somehow brought the evidence in this case out of the purview of reliability as discussed in *Muhammad*, he has not supported such allegations with any evidence or affidavits. *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015) (explaining that a defendant bears the burden of establishing the factual predicate for a claim of ineffective assistance).

Defendant also argues that counsel should have brought out more information on cross-examination regarding how easily DNA is transferred. He states, "The jury . . . needed someone to make them aware of the possibility that the one sperm found on [SD's] underwear got there from contact with the bed, not a sexual act." Even disregarding the fact that it was fraction one of the underwear cutting and not the sperm-containing fraction two that led to the statistically significant results, counsel elicited from Scott that "an average ejaculate should contain millions upon millions of sperm cells." Counsel then asked, "[W]hen you examined this, you only found a single sperm cell[,] correct?" Counsel also elicited from Scott that epithelial cells can sometimes be mistaken for sperm cells. And he elicited that it would probably take multiple washings for sperm cells to be removed from clothing such as JB's pants and sweatshirts. Counsel's cross-examination of Scott was indeed quite extensive. It is not apparent that further cross-examination would have likely affected the outcome of the trial, *Ackley*, 497 Mich at 389, especially when defendant puts forth no evidence or expert analyses on the likelihood of defendant's DNA ending up in the area of SD's underwear from which the cutting was taken.

## IV. ADMISSION OF JB'S PRIOR FALSE ALLEGATION

On April 16, 2018, the prosecutor filed a motion in limine requesting that "no witnesses, including SD's and JB's friend Kayla Estep, be allowed to make unsupported statements about either victim's alleged sexual history, whether consensual or nonconsensual." The prosecutor stated:

> In her interview with police, Kayla Estep made a statement that [JB] has made similar allegations like this in the past. There is no indication that this statement is true or has any merit. There are no pending cases regarding any of these allegations and there has not been a showing made by the [d]efense that allegations have been made.

---

[7] The *Muhammad* panel, too, specifically concluded that STRmix analyses were admissible under MRE 702. *Muhammad*, 326 Mich App at 57.

Defendant objected. As an offer of proof, defendant stated in his motion:

Based on the police report provided by the people, Kayla Estep told . . . [Detective Sergeant] Surface that:

a) "[JB and SD] are lying".

b) "[JB] has accused other people of the same thing a few times."

c) "[JB] does this to get out of trouble because she has a boyfriend, a job, and misses her curfew."

He added:

Further, upon information and belief, Kayla will testify that:

a. [JB's] parents filed a runaway petition because [JB] has not returned home.

b. When [JB] was eventually found, she stated that she was with a man, believed to be Damian Peterson, who refused to allow her to leave him and return home.

c. The reason [JB] told her parents this was because she did not wish to get into trouble.

At the hearing, defendant's attorney also stated on the record:

[Estep] informed me there had been a prior incident where [JB] . . . may or may not have run away from home and her parents had filed a runaway petition against her, and then [JB] had informed her parents that she was with a young man by the name of Damien Peterson. And the reason that she was with him and had not returned home was because he would not allow her to return home.

Based on this offer of proof, defendant requested that the trial court conduct an evidentiary hearing in camera and decide whether JB's prior false allegation was admissible. The trial court ultimately granted the prosecution's motion to disallow evidence about JB's prior false allegation without conducting defendant's requested evidentiary hearing.

On appeal, defendant argues that this ruling was error. Assuming without deciding that the trial court erred—that it should have conducted an evidentiary hearing to determine if evidence of a prior false accusation by JB was admissible—defendant is still not entitled to relief. MCL 769.26 states:

No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court,

-9-

after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

This statute "places the burden on a defendant to demonstrate a miscarriage of justice[.]" *People v Lukity*, 460 Mich 484, 494; 596 NW2d 607 (1999). In addition, an appellant bears "the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal [is] predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Defendant has not provided this Court with any information beyond his initial offer of proof to demonstrate that evidence of a false allegation by JB would, in fact, have been admissible following an evidentiary hearing. Thus, he has not met his burden of establishing that reversal is warranted.

Defendant also argues that the trial court's decision to exclude the prior false allegation violated defendant's constitutional right to present a defense. Because defendant did not raise this issue in the trial court, it is reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Under the plain-error doctrine, the threshold inquiry is whether a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Id*. Because defendant has not provided this Court with any information beyond his initial offer of proof to demonstrate that evidence of a false allegation by JB would have been admissible following an evidentiary hearing, we conclude that defendant has not demonstrated the existence of an outcome-determinative error.

## V. COMPROMISE VERDICT

Defendant argues that the jury's decision to convict defendant for the allegations that pertained to SD but not the allegations with respect to JB was inconsistent and necessarily the result of compromise, and so was impermissible. We disagree. This unpreserved issue is reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

In *People v Putnam*, 309 Mich App 240, 251; 870 NW2d 593 (2015), this Court explained that inconsistent verdicts by a single jury are permissible absent a showing that the jurors were "confused, that they misunderstood the instructions, or that [they] engaged in an impermissible compromise." Defendant argues that the verdicts here were inconsistent, that they must have resulted from an impermissible compromise, and that, therefore, reversal is warranted. But the premise of defendant's argument is faulty because the verdicts were not inconsistent.

In order to obtain a conviction, a prosecutor must "prove the elements of [a charged] crime beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). The obvious corollary of this is that acquittal is necessary when the prosecutor has not proven the elements of a crime beyond a reasonable doubt.

JB's testimony differed from SD's in that she had more lapses in memory about the alleged sexual assaults. When asked what defendant did after he made SD and JB take off their clothes, JB said, "I don't remember." She also said, "I don't remember" when asked what happened after she swallowed a pill from defendant. SD testified that she (SD) did not swallow the pill from defendant but that JB did, and that, after taking the pill, JB "couldn't really do much" and her "eyes were rolling in the back of her head." In addition, there was "strong

support" that defendant contributed to a DNA mix on SD's underwear, while JB refused to be examined at the hospital. It is entirely possible that the jurors concluded that the prosecution adequately proved the offenses related to SD but that, because of JB's lapses in memory, JB's impairment due to the pill ingestion, and the lack of DNA evidence related to JB's allegations, the jury found that the prosecution failed to prove *beyond a reasonable doubt* that defendant sexually penetrated JB or restrained her for the purpose of committing sexual penetration or contact. MCL 750.520b(1); MCL 750.349(1). No clear or obvious error is apparent with the jury's verdicts. *Carines*, 460 Mich at 763.

## VI. CHALLENGES TO SENTENCE

Defendant argues that he was inappropriately designated a "super habitual" offender because two of the prior felonies that the prosecution relied on to give defendant that designation appear to have arisen from the same transaction, which is not allowable under MCL 769.12(a)(a). Defendant additionally argues that Offense Variables (OVs) 4 and 7 were scored incorrectly. None of defendant's challenges to his sentence warrant relief.

The claim involving the "super habitual" supplement involves an allegation that the trial court relied on inaccurate information in sentencing defendant. In *People v Harrison*, 119 Mich App 491, 496; 326 NW2d 827 (1982), this Court stated that a "judge's response to a claim of inaccuracy is within his or her sound discretion and that discretion is to be exercised with the view of imposing a sentence based upon accurate information." As for the arguments about the OVs, "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), superseded in part by statute as stated in *People v Rodriguez*, ___ Mich App ___, n 3; ___ NW2d ___ (2019) (Docket No. 338914); slip op at 3 n 3. "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id.*

MCL 769.12(1) states, in part:

If a person has been convicted of any combination of 3 or more felonies or attempts to commit felonies, whether the convictions occurred in this state or would have been for felonies or attempts to commit felonies in this state if obtained in this state, and that person commits a subsequent felony within this state, the person shall be punished upon conviction of the subsequent felony and sentencing under section 13 of this chapter as follows:

(a) If the subsequent felony is a serious crime or a conspiracy to commit a serious crime, and 1 or more of the prior felony convictions are listed prior felonies, the court shall sentence the person to imprisonment for not less than 25 years. Not more than 1 conviction arising out of the same transaction shall be considered a prior felony conviction for purposes of this subsection only.

The definition of "serious crime" includes a violation of MCL 750.520b. MCL 769.12(6)(c). In addition, " 'Listed prior felony' means a violation or attempted violation" of various statutes,

including MCL 750.82. See MCL 769.12(6)(a)(*iii*). MCL 750.82 deals with "assault[] . . . with a . . . dangerous weapon," otherwise known as felonious assault. Defendant was convicted in 2001 of attempted assault with a dangerous weapon.

In the prosecutor's notice of intent to seek sentencing enhancement, she stated that the prior convictions being relied on were the following: (1) LC No. 93-11147-FH, "B&E W/INTENT," with a conviction date of March 16, 1993, in Mason County in Michigan; (2) LC No. 92-11144-FH, "CCW," with a conviction date of March 16, 1993, in Mason County in Michigan; and (3) LC No. 01-06331-FH, "FA,"[8] with a conviction date of November 13, 2001, in Wexford County in Michigan.

At sentencing, after the parties discussed the scoring of various OVs, the court noted that the guidelines range for defendant's minimum sentence was 171 to 570 months' imprisonment. The court then acknowledged that "the prosecution did file a timely notice of habitual offender fourth," and stated that "171 to 570 are the advisory guidelines, but this [c]ourt does not have any discretion in your case in terms of the minimum sentence. The [c]ourt must sentence you to 25 years." The court imposed sentences of 25 to 37½ years' imprisonment. It stated that it had the discretion to impose consecutive sentences but was declining to do so.

Defendant contends that the 25-year minimum sentence in MCL 769.12(1)(a) was inapplicable because "two of the prior felonies appear to arise out of the same transaction." He argues, "If [the convictions] arose from different transactions, nothing in the record indicates that and the burden is on the moving party, the filer of the supplement, to show different transactions were involved." The PSIR gives an offense date and an arrest date of "12/04/1992" for LC No. 93-11144-FH and for LC No. 93-11147-FH. Ignoring anything provided on appeal and looking solely at the lower court record as it stands, it is certainly a *possibility* that the two offenses arose from the same transaction. It is not, however, an apparent *fact*, considering that the two cases were assigned different numbers in the circuit court. Indeed, one would assume that if the breaking-and-entering offense and the carrying-a-concealed-weapon offense were part of the same transaction, a single circuit-court number would have been assigned, just as a single circuit-court number was assigned for the various charged offenses in the present case. As noted earlier, an appellant bears "the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal [is] predicated." *Elston*, 462 Mich at 762. In our opinion, defendant has failed to provide this Court with sufficient information to conclude that an error occurred with regard to the "super habitual" supplement. That is, defendant has not carried his burden of showing entitlement to any appellate relief because the existing record is insufficient to demonstrate that an error occurred.

Turning to defendant's challenge to the scoring of his OVs, he received 10 points for OV 4. For this OV, which deals with "psychological injury to victim," a score of 10 points is warranted if "[s]erious psychological injury requiring professional treatment occurred to a

---

[8] This is a reference to defendant's conviction of attempted felonious assault.

victim." MCL 777.34(1)(a).[9] MCL 777.34(2) states, "Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive."

In *People v White*, 501 Mich 160, 163; 905 NW2d 228 (2017), the trial court approved a 10-point score for OV 4, stating that because the victim had been afraid, had been held at gunpoint, and had heard what she thought was a trigger being pulled, it was a reasonable inference that the victim suffered psychological injury. The *White* Court concluded that (1) a court cannot assume the existence of psychological injury merely based on the circumstances of the crime and (2) a mere expression of fearfulness is insufficient to support a 10-point score for OV 4. *Id*. at 163-165. However, the *White* Court also stated:

> Of course, a victim's fear while a crime is being committed may be highly relevant to determining whether he or she suffered a "serious psychological injury [that] may require professional treatment" and thus may be considered together with other facts in determining how to score OV 4. We merely hold that, *absent other evidence of psychological harm*, fear felt during the crime is insufficient to assess points for this variable. [*Id*. at 165 n 3.]

Evidence showed that SD was afraid during the incident. The SANE described her as anxious, crying, and withdrawn after the incident. Henderson described her as "very, very upset," crying, and shaking. Most significantly, Henderson testified that SD's "whole personality changed" after the incident and that SD became "very depressed" and "wouldn't get out of bed for days." Henderson stated that SD missed many days of school because "she just couldn't emotionally handle it." The assessment of 10 points for OV 4 was thus appropriate because the evidence was indicative of a serious psychological injury requiring professional treatment.

Defendant also challenges the trial court's scoring of 50 points for OV 7. MCL 777.37(1)(a) provides for a score of 50 points for OV 7 if "[a] victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(2) states, "Count each person who was placed in danger of injury or loss of life as a victim." In determining whether conduct was designed to increase fear and anxiety in a victim, a court should assess whether "the defendant engaged in conduct beyond the minimum necessary to commit the crime, and whether it is more probable than not that such conduct was intended to make the victim's fear or anxiety increase by a considerable amount." *Hardy*, 494 Mich at 443.

SD testified that defendant "stuck [the gun] on [her] forehead." She used her index finger to make a gesture at trial to demonstrate the action. When asked, "Do you remember if he ever told you nobody was gonna find you guys," SD answered, "Yeah." SD said that defendant "proceeded to tell me that I wasn't going home and that my parents didn't care about me." SD

---

[9] MCL 777.34 was amended in 2018, but the amendment does not implicate the present case in any fashion. See 2018 PA 652.

testified that she believed him and was scared. Significantly, she said, "I think he was just trying to psyche me out." SD also noted that defendant "made" JB take a pill, that JB's eyes "were rolling in the back of her head" afterwards, and that defendant made JB urinate in a trash can.[10] This evidence supported a finding that defendant engaged in highly egregious conduct that went beyond the minimum necessary to commit the crimes and that was designed to substantially increase SD's fear and anxiety. Thus, the trial court's scoring of OV 7 was not error.

## VII. STANDARD 4 BRIEF

Defendant raises several challenges in his Standard 4[11] brief, none of which warrant appellate relief. We address each challenge in turn.

## A. JURY INSTRUCTIONS

Defendant argues that the trial court erred by instructing the jury on the elements of kidnapping because the court did not include an asportation element. Defendant also argues that the trial court's instructions for CSC-I were insufficient because the court allegedly failed to state that a conviction for CSC-I requires penetration. Neither argument has merit.

Defendant did not object to the instructions at trial, so our review is for plain error affecting substantial rights. . *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011).

With regard to the charge of CSC-I against SD, the trial court instructed the jury, in relevant part, that the prosecutor needed to prove "that the defendant engaged in a sexual act that involved [the] touching of [SD's] genital opening with the defendant's mouth or tongue."

A conviction under MCL 750.520b(1) requires "sexual penetration." "Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r). In *People v Legg*, 197 Mich App 131, 132; 494 NW2d 797 (1992), this Court stated that "[a]n act of cunnilingus, by definition, involves an act of sexual penetration." The Court explained that "cunnilingus requires the placing of the mouth of a person upon the external genital organs of the female which lie between the labia, or the labia itself [sic], or the mons pubes [sic]." *Id*. at 133 (quotation marks and citation omitted; bracketing added by *Legg*). The *Legg* Court stated, "Defendant's touching with his mouth of the urethral opening, vaginal opening, or labia establish cunnilingus." *Id*. The trial court's instructions were in accordance with this applicable law, so defendant's argument is without merit.

As for kidnapping, defendant cites cases suggesting that, to sustain a conviction for kidnapping involving forcible confinement, the prosecution must prove asportation (movement

---

[10] Defendant's actions toward JB would have had an effect on SD, who observed them.

[11] Supreme Court Administrative Order No. 2004-6, Standard 4.

of the victim). See, e.g., *People v Wesley*, 421 Mich 375, 384; 365 NW2d 692 (1984). And he correctly notes that the trial court did not instruct the jury on asportation. The *Wesley* Court stated, "In order to preserve the forcible confinement section of the kidnapping statute from a charge of unconstitutionality, this Court has interpolated the element of asportation in connection with it." *Id*. at 385. In *People v Green*, 228 Mich App 684, 696; 580 NW2d 444 (1998), this Court stated, "Although not mentioned in the statute, asportation of the victim is a judicially required element of the crime of kidnapping by forcible confinement or imprisonment."

The kidnapping statute, before the enactment of 2006 PA 159, stated, in pertinent part:

> Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years. [1970 CL 750.349; see also *People v Jaffray*, 445 Mich 287, 296 n 17; 519 NW2d 108 (1994).]

Since the enactment of 2006 PA 159, MCL 750.349 now states:

> (1) A person commits the crime of kidnapping if he or she knowingly restrains another person with the intent to do 1 or more of the following:
>
> (a) Hold that person for ransom or reward.
>
> (b) Use that person as a shield or hostage.
>
> (c) Engage in criminal sexual penetration or criminal sexual contact prohibited under chapter LXXVI with that person.
>
> (d) Take that person outside of this state.
>
> (e) Hold that person in involuntary servitude.
>
> (f) Engage in child sexually abusive activity, as that term is defined in section 145c, with that person, if that person is a minor.
>
> (2) As used in this section, "restrain" means to restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority. The restraint does not

have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts.[12]

The prosecutor contends that the judicially-created asportation element did not survive the 2006 amendment of the kidnapping statute. We need not address this issue, however, because our reading of *Wesley* leads us to conclude that defendant's argument does not warrant relief. In *Wesley*, 421 Mich at 385, the Court indicated that the asportation element was judicially added to the statute to avoid the danger of prosecutorial overcharging. It explained that several offenses, such as assault, robbery, or rape, often necessarily involve some amount of forcible confinement, so a prosecutor could elevate a misdemeanor charge of, for example, simple assault into a felony charge of kidnapping even if no other elements were present aside from the simple assault itself. *Id*. The Court elaborated, however, that "a specific intent requirement obviates the need to read an asportation element into the statute." *Id*. at 390. The Court concluded that such a requirement obviates the dangers "of overcharging or inappropriate punishment[.]" *Id*. The Court in *Wesley* was dealing with the specific intent to secretly confine or the specific intent " 'to hold to service[.]' " *Id*. at 390-391. In essence, it concluded that proof of these intents abolished the concern about overcharging. *Id*. at 390. These principles also apply to a specific intent to commit criminal sexual penetration—the intent at issue here. Indeed, if a person restrains another with the intent to commit sexual penetration or contact, this restraint is separate from the restraint involved *during the penetration or contact itself* and represents a separate wrongdoing.[13] That is, it involves a "separately cognizable offense." See, generally, *id*. at 387 (quotation marks and citation omitted).

The *Wesley* Court cited favorably the opinion of Justice KAVANAGH in *People v Barker*, 411 Mich 291; 307 NW2d 61 (1981).[14] See *Wesley*, 421 Mich at 390. In his opinion in *Barker*, Justice KAVANAGH opined that overbreadth in regard to the offense of kidnapping could be avoided by insisting that, to justify a conviction, the confinement be for purposes as specified in the statute; he opined that no asportation element should be judicially "imported" into the statute. *Barker*, 411 Mich at 303 (KAVANAGH, J., concurring). He stated, "In the instant cases while the defendants in fact confined the complainants, the ultimate purpose of such confinement was shown to be criminal sexual conduct. Confinement for that purpose is not covered by our

---

[12] The statute was amended by 2014 PA 330, effective January 14, 2015; this amendment added subparagraph (1)(f), as well as the phrase "prohibited under chapter LXXVI" in subparagraph (1)(c).

[13] Under MCL 750.349(1)(c), the pertinent intent for kidnapping is the intent to "[e]ngage in *criminal* sexual penetration or criminal sexual contact[.]" (Emphasis added.) When sexual penetration becomes "criminal" only because it is occurring "under circumstances involving the commission of any other felony," see MCL 750.520b(1)(c), and the "other felony" is kidnapping, then the issue of intent becomes a bit circular. The fact remains, however, that restraint with the intent to commit penetration is separate from restraint occurring *during* penetration.

[14] The majority opinion in *Barker* was partially overruled by *Wesley*, 421 Mich at 386 n 3.

-16-

kidnaping [sic] statute." *Id*. Now, "[c]onfinement for that purpose" *is* covered by the kidnapping statute. See MCL 750.349(1)(c).

Ultimately, the *Wesley* Court stated that "asportation is required as an element of kidnapping *only* where the charge is forcible confinement (a)," *Wesley*, 421 Mich at 391 (emphasis added), which, as defined by the *Wesley* Court, involved confining a person against that person's will, *without mention of any intent*, see *id*. at 383. In light of *Wesley* and the principles discussed in that case, defendant's argument on appeal is without merit because he was convicted for restraining SD "with the intent" to commit criminal sexual penetration or criminal sexual contact. MCL 750.349(1)(c). Thus, an asportation element was not required under the holding of *Wesley*.[15]

## B. DOUBLE JEOPARDY

Defendant argues that his protections against double jeopardy were violated; he contends that he received multiple punishments for the same offense because the kidnapping offense was used as the basis for the CSC-I offense. We disagree. This Court "review[s] an unpreserved claim that a defendant's double jeopardy rights have been violated for plain error that affected the defendant's substantial rights, that is, the error affected the outcome of the lower court proceedings." *People v McGee*, 280 Mich App 680, 682; 761 NW2d 743 (2008).

Both the United States Constitution and the Michigan Constitution contain protections against double jeopardy. US Const, Am V; Const 1963, art 1, § 15. One of these double-jeopardy protections is the protection against multiple punishments for the same offense. *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004). In *People v Smith*, 478 Mich 292, 315-316; 733 NW2d 351 (2007), our Supreme Court explained that where the Legislature clearly intends to impose multiple punishments for the same offense, imposition of such sentences does not violate the Constitution.

The kidnapping statute states, "This section does not prohibit the person from being charged with, convicted of, or sentenced for any other violation of law arising from the same transaction as the violation of this section." MCL 750.349(4). And the statute, in defining the crime of kidnapping, explicitly refers to the chapter of the Michigan Penal Code containing CSC-I. MCL 750.249(1)(c). Accordingly, the Legislature has clearly expressed its intent to authorize multiple punishments for defendant's two crimes, so his multiple convictions do not violate double jeopardy protections. See *Smith*, 478 Mich at 315-316.

## C. INEFFECTIVE ASSISTANCE

Defendant first argues that his trial counsel was ineffective for failing to interview and call Dr. Kelli T. Fritz and Michael Shirley. Dr. Fritz was the physician who examined SD and,

---

[15] Defendant also contends that counsel was ineffective for not challenging the jury instructions at trial. Because the instructions were proper, counsel was not ineffective for failing object to them. *Horn*, 279 Mich App at 39-40 (discussing futile objections).

according to defendant, "may have had valuable information." Defendant also contends that Michael was present at the scene of the crimes alleged and "may have had important information that may have determined the outcome of [d]efendant's case."

To obtain relief based on ineffective assistance of counsel, a defendant must establish a *reasonable probability* that counsel's actions affected the outcome of the proceedings. *Ackley*, 497 Mich at 389. The "possibility" of valuable information does not demonstrate such a reasonable probability. Defendant has simply not established any factual predicate for the claim of ineffective assistance of counsel in conjunction with the failure to present, and the alleged failure to interview, these two witnesses. *Cooper*, 309 Mich App at 80.

Defendant also argues that trial counsel "failed to capitalize on the flaws in the State's case regarding identification of the defendant." Defendant's assertions in this regard are vague. He provides no information regarding what these supposed flaws were or how his attorney should have "capitalize[d]" on them. He cites a police report and a "Patient Examiner form," but (1) these documents are not in the record provided to this Court, and (2) defendant does not tell us what relevant information they supposedly contain. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Defendant lastly argues that trial counsel "failed to object to inaccurate information stated by the prosecutor during her closing arguments . . . concerning the presence of defendant's saliva . . . on [SD's] vagina." Defendant's assertion of error does not warrant reversal. Scott testified that an analysis of SD's underwear showed "the possible presence of salivary amylase," which is "the protein or enzyme that is found in saliva." She stated that the test was "a presumptive test because there are the known false positive[s] with other bodily fluids."

Defendant is correct that the prosecutor should not have said, "You heard that there was salivary amylase" in SD's underwear, because Scott testified only about the "possible presence" of it. But a prosecutor's remarks are to be viewed in context, and a prosecutor "is permitted to argue . . . all reasonable inferences arising from" the evidence. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). Viewed in context, the gist of the prosecutor's remarks was that defendant's DNA and saliva were in SD's underwear because he had performed cunnilingus on her, as detailed by SD. In addition, the trial court stated that the remarks of counsel were not evidence and were "only meant to help you understand the evidence and each side's legal theories." Also, defense counsel elicited that the presumptive test for salivary amylase can show a positive result from other substances, such as urine, and it was undisputed that the underwear cuttings contained a *mixture* of DNA. In other words, counsel took steps to undercut the assertion that defendant's saliva was in SD's underwear. Under these circumstances, defendant has not established the prongs for a successful claim of ineffective assistance of counsel in connection with counsel's failure to object to the prosecutor's remarks. *Ackley*, 497 Mich at 389.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Michael F. Gadola
/s/ James Robert Redford